UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------x

BORIS ABAYEV AND REGINA ABAYEV,

                Plaintiffs,        **MEMORANDUM & ORDER**
                                  22-CV-386 (EK)(JRC)

          -against-

AMERICAN AIRLINES, INC.,

                Defendant.

------------------------------------x

ERIC KOMITEE, United States District Judge:

      In January 2021, while the COVID-19 pandemic was still ongoing, Boris and Regina Abayev (the "Abayevs") boarded an American Airlines flight in Phoenix, Arizona.  Prior to takeoff, American employees removed Boris Abayev from the plane.  He claims his removal was due to his nationality (he is Tajikistani); American asserts that he was removed for refusing to wear his mask properly.  Regina (Abayev's daughter) claims that an American employee verbally abused her in the course of these events.

      The Abayevs subsequently sued American.  They initially asserted several causes of action, but they have since withdrawn all but their Title VI claim (alleging discrimination by a recipient of federal financial assistance).

      American moved for summary judgment on that claim, arguing that the Abayevs are not intended beneficiaries of any

federally funded program or activity.  Following oral argument, the Court called for additional information concerning the federal-funding issue, and letter-briefing on a new issue: "whether *respondeat superior* liability should lie here and, if not, whether the Abayevs have adduced sufficient evidence to hold the corporate entity liable."  *See* Docket Orders dated July 31, 2025.  In the end, the *respondeat superior* issue is dispositive: the Abayevs cannot hold American liable under Title VI for the actions of its lower-level employees.  For this reason, summary judgment must be granted.

## I.   Background

The facts in this order are drawn from the parties' submissions in connection with the motion for summary judgment, including the defendant's Local Rule 56.1 Statement ("Def. 56.1" (ECF No. 34-1)) and plaintiffs' response ("Pl. 56.1 Resp." (ECF No. 35-1)).  This order also takes judicial notice of "documents retrieved from official government websites," *Vill. Green At Sayville, LLC v. Town of Islip*, 43 F.4th 287, 299 n.7 (2d Cir. 2022), as well as "legally required public disclosure documents filed with the SEC."  *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd*., 493 F.3d 87, 98 (2d Cir. 2007).[1]  We view the facts in the light

---

[1] Unless otherwise noted, when quoting judicial decisions this order accepts all alterations and omits all citations, footnotes, and internal quotation marks.

most favorable to the plaintiffs.  *Aegis Ins. Servs., Inc. v. 7 World Trade Co., L.P.*, 737 F.3d 166, 176 (2d Cir. 2013).

The Abayevs boarded a flight from Phoenix to New York City in January 2021.  Pls.' 56.1 Resp. ¶ 1, ECF No. 35-1.  At that time, when the COVID-19 pandemic remained a prominent public-health concern, American maintained a policy requiring passengers to wear a face mask over their nose and mouth.  *Id.* ¶ 3.  After boarding, the Abayevs heard an announcement advising all passengers of this mandate.  *Id.* ¶ 7.  The Abayevs admit that they were aware of the requirement.  *Id.* ¶ 2.

**A.   Boris Abayev's Removal from the Plane**

The parties' accounts of Boris Abayev's removal differ significantly.  (Because most of the operative factual allegations concern Boris Abayev, and not his daughter, we refer to Mr. Abayev simply as "Abayev.")  Abayev claims he lowered his mask to take medication.  *Id.* ¶ 17.  After a flight attendant told Abayev to put his mask back on, Abayev responded that he first needed to take his medication.  *Id.* ¶ 18.  According to Abayev, the flight attendant then began yelling and waving his hands in Abayev's face, knocking Abayev's pills out of his hand. *Id.* ¶¶ 19-20.  Abayev claims that the flight attendant also heard Abayev and his family speaking Russian, and told them to "speak English."  *Id.* ¶ 22.  When Regina Abayev tried to explain

the situation to the flight attendant, he told her to "shut up." *Id.* ¶ 23.[2]

American's account rests primarily on the testimony of this flight attendant. He testified that a colleague alerted him to an issue with a passenger's mask and responses to questions about sitting in an exit row. Dep. of Lars Kindem ("Kindem Dep.") 37:10-38:22, ECF No. 34-11.[3] The flight attendant informed Abayev he would need to pull his mask up. *Id.* at 52:20-53:2. He claims he made no physical contact with Abayev. *Id.* at 61:15-17.

Later, that same flight attendant was informed by a colleague that Abayev's mask remained lowered. *Id.* at 58:19-59:15. He informed the pilot, who directed him to remove Abayev from the plane. *Id*. The flight attendant testified that he did not hear the Abayevs speaking Russian until *after* the pilot had directed him to remove Abayev. *Id.* at 40:4-20.

The flight attendant then filed an incident report, recommending that Abayev be banned from American flights for not complying with American's mask requirement. Incident Rep. 5-6, ECF No. 34-13. An American employee subsequently told Abayev that he was not allowed to fly on American. Dep. of Boris

---

[2] Boris Abayev also testified that the flight attendant saw him wearing a Star of David necklace. Pls.' 56.1 Resp. ¶ 21. But this fact is not material, as Title VI does not extend to religious discrimination.

[3] Page numbers in citations to record documents other than deposition transcripts and briefs refer to ECF pagination.

Abayev 53:25-54:3, ECF No. 34.  Abayev also received an email
from American informing him that he would no longer be permitted
to travel on the airline until the face mask policy was lifted.
Abayev Ban 2, ECF No. 34-17.

## B.    Procedural History

The Abayevs filed suit in January 2022, alleging
violations of 42 U.S.C. § 1981, Title VI, the Federal Aviation
Act, and state tort law.  Compl., ECF No. 1.  American did not
to move to dismiss.  Later, the Abayevs withdrew "all other
causes of action previously asserted" aside from the Title VI
claim.  Pls.' Resp. Mem. 1, ECF No. 35.  American has moved for
summary judgment on that issue.

The Court requested additional information regarding
the federal financial assistance American had received.  *See*
Docket Order dated July 31, 2025.  It also notified the parties
on July 31 that it was contemplating summary judgment on the
*respondeat superior* issue, and invited supplemental submissions.
*See* Mem. & Order 1-2, ECF No. 37; Fed. R. Civ. P. 56(f).

## II.  Legal Standard

Summary judgment is appropriate when there is no
genuine dispute of material fact, such that the movant is
entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a).
A dispute is genuine if a "reasonable jury could return a
verdict for the nonmoving party."  *Frost v. N.Y.C. Police Dep't*,

5

980 F.3d 231, 242 (2d Cir. 2020).  And "[a] fact is material if it might affect the outcome of the suit under governing law." *Id.*

The movant bears the burden of showing that there is no genuine dispute of material fact.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  If the movant carries that burden, "the nonmoving party must come forward with admissible evidence sufficient to raise a genuine issue of fact for trial in order to avoid summary judgment."  *Jaramillo v. Weyerhaeuser Co.*, 536 F.3d 140, 145 (2d Cir. 2008).  If the nonmoving party fails to do so, the Court should grant summary judgment.  In performing this analysis, the Court resolves all ambiguities and draws all inferences in favor of the nonmoving party.  *E.g.*, *Gallo v. Prudential Residential Servs., Ltd. P'ship*, 22 F.3d 1219, 1223 (2d Cir. 1994).

### III. Discussion

We take up two issues in this discussion: whether American received federal financial assistance "as a whole," as required to hold it liable under Title VI, and whether the Abayevs have adduced sufficient evidence to hold American liable for the acts of its employees.  Our discussion of the first resolves the motion only in part, whereas the second is dispositive of the entire case.  Nevertheless, we set out our

analysis on the first issue at some length, given this Court's divergence from prior opinions on the issue.

## A.    Federal Financial Assistance Under Title VI

Title VI prohibits "discrimination under any program or activity receiving [f]ederal financial assistance."  42 U.S.C. § 2000d.  As relevant here, the statute defines the phrase "program or activity" to extend to "all of the operations of . . . an entire corporation" if — but only if — financial assistance is extended to that corporation "as a whole."  *Id.* § 2000d-4a(3)(A)(i).

American received two sources of financial assistance from the federal government during the time period at issue: the Essential Air Service ("EAS") program and the Payroll Support Program ("PSP").  In their briefs, the parties engage at some length with the rule set forth in *Association Against Discrimination in Employment, Inc. v. City of Bridgeport*, 647 F.2d 256, 276 (2d Cir. 1981), which required "a logical nexus between the use of federal funds and the practice toward which agency action is directed."  But the legal standard set out in that case has been superseded by statute, as discussed below.

**B.    Reading Section 2000d-4a: Funding to the Corporation "As a Whole"**

With the Civil Rights Restoration Act of 1987,[4] Congress "overruled prior case law requiring a close nexus between the beneficiaries of federal funding and the alleged discrimination." *Bloomberg v. N.Y.C. Dep't of Education*, 119 F.4th 209, 215 (2d Cir. 2024); *see also O'Connor v. Davis*, 126 F.3d 112, 117 (2d Cir. 1997).  Now, we ask where the federal funding went.  If it was extended to the corporation "as a whole," then *all* of the operations of the company will constitute the "program or activity" at issue, and any discrimination, anywhere in the company, will be actionable under Title VI.  42 U.S.C. §§ 2000d-4a, 2000d-4a(3)(A)(i).

In determining whether federal assistance was extended to a corporation "as a whole," some district courts have looked to the *purpose of* the funding.  Often relying on legislative history, these courts have concluded that funding extended for a "specific purpose" is not assistance to the company "as a whole."  So, in *Collins v. Giving Back Fund*, the district court cited a Senate Report in observing that "as a whole means that federal assistance is extended to the organization otherwise than for some specific purpose."  No. 18-CV-8812, 2019 WL 3564578, at *11 (S.D.N.Y. Aug. 6, 2019) (citing S. Rep No. 100-

---

[4] Pub. L. No. 100-259, § 6, 102 Stat. 28, 31 (codified at 42 U.S.C. § 2000d-4a).

64, at 17 (1987)).  In a similar vein, *Abadi v. American Airlines, Inc.* held that the Coronavirus Aid, Relief, and Economic Security Act ("CARES Act") — one of the statutes at issue here — "was aimed at helping businesses make payroll and pay operating expenses in order to keep people employed through the economic downturn," and therefore had not been extended to the company "as a whole."  No. 23-CV-4033, 2024 WL 1346437, at *33 (S.D.N.Y. Mar. 29, 2024).

In my view, however, the text of the statute counsels a different approach.  The more natural reading is that the statute uses the phrase "as a whole" to describe the breadth of the company's operations that are affected by the funding.  The statute explicitly directs a focus on what parts of a company the money goes "to," not what purpose it goes "for."  *See* 42 U.S.C. § 2000d-4a(3)(A)(i) ("if assistance is extended *to* such corporation . . . as a whole") (emphasis added).

This reading becomes even more compelling when one compares subsection 3(A), which refers to the corporation as a whole, to subsection 3(B), which speaks to an "entire plant or other comparable, geographically separate facility."  The contrast between these two provisions provides an answer to the question: the corporation "as a whole," as opposed to what?  The answer is: as opposed to a single plant, a geographically separate unit, or the like.  Thus, the relevant inquiry under

9

subsection 3(A) will ask whether the funding in question benefits all (or at least most) of a company's component parts or, on the other hand, a narrower slice of its operations — only one (or a few) "plants," functions, regions, subsidiaries, or (in the case of an airline) routes.[5]

This is consistent with common usage of the phrase at issue.  One dictionary defines "as a whole" to mean "[a]ll parts or aspects considered; altogether."  American Heritage Dictionary (3d ed. 1992); *see also As a Whole*, Merriam-Webster.com Dictionary ("as a complete unit . . . used to make a statement that relates to all the parts of something");[6] *As a Whole*, Cambridge English Dictionary ("when considered as a group and not in parts").[7]  In the corporate context, Investopedia uses the phrase "company as a whole" in describing consolidated financial statements: they are "the combined financial statements of the *parent company and all of its subsidiaries*. The consolidated financial statements give an overview of how well the entire corporation is being managed and are useful in

---

[5] This focus is consistent with the view expressed by a district court confronting similar language in the Rehabilitation Act.  In *Faris v. Centers for Disease Control*, the court acknowledged precedents focusing on the "particular purpose" analysis, but went on to observe that that focus "does not obviously follow from the statutory text itself," and to deny the motion to dismiss.  No. 22-CV-23, 2024 WL 4369899, at *13 (W.D. Ky. Sept. 30, 2024).

[6] Accessible at https://www.merriam-webster.com/dictionary/as%20a%20whole (last accessed Sept. 22, 2025).

[7]  Accessible at https://dictionary.cambridge.org/us/dictionary/english/as-a-whole (last accessed Sept. 22, 2025).

valuing *the company as a whole*." Caroline Banton, *Are Subsidiaries Included in Company Statements?*, Investopedia (June 30, 2021) (emphases added).[8]

The same phrase appears in the transcript of a recent *Bloomberg Businessweek* podcast. There, editor Brad Stone and reporter David Gura discussed the LVMH conglomerate and its acquisition of "other fashion houses, along with watchmakers and jewelry designers, and the cosmetics retailer Sephora." *See* David Gura & Thomas Lu, *Big Take Podcast: How Bernard Arnault Built LVMH Into a Luxury Powerhouse*, Bloomberg (June 25, 2024).[9] At one point, Gura asks: "[W]hen you look at this *company as a whole*, how do all of these brands work together?" *Id.* (emphasis added).[10] The question emphasizes the difference between a company's integrated operation and its component brands — the whole versus the parts. The conversation makes no reference to the company's *purpose.*

---

[8] Accessible at https://www.investopedia.com/ask/answers/06/subsidiarycbsheet.asp (last accessed Sept. 22, 2025).

[9] Accessible at https://www.bloomberg.com/news/articles/2024-06-25/luxury-brands-dior-louis-vuitton-celine-tiffany-are-key-to-lvmh-empire (last accessed Sept. 22, 2025).

[10] This emphasis continues in Stone's answer: "Yeah, to the casual shopper, it may seem like they're totally separate. But behind the scenes, there are incredible synergies and economies of scale — from the supply chain to marketing, the way in which they can command lower rates across all the media properties in the world, to executives who will shuffle from one brand to the other." *Id.* Again, the speaker is referring to the sum of the corporate parts — in this case, a collection of affiliated subsidiaries under a single parent — and not to any breadth of purpose.

As in business, so too in law.  The phrase "as a whole" is one that judges regularly confront in the interpretation of statutes, contracts, and other texts.  In statutory construction, it is a "cardinal rule that a statute is to be read as a whole."  *King v. St. Vincent's Hosp.*, 502 U.S. 215, 221 (1991).  In contract law, the "writing is interpreted as a whole."  *See* Restatement (Second) of Contracts § 202(2). These principles do not dictate a resort to purpose; instead, they require that all *parts* of a statute's (or contract's) text be considered.

On the other side of the ledger, the courts focused on the "purpose" of federal funding tend to provide examples that do not withstand scrutiny.  One frequently repeated example is that of financial assistance "for the purpose of preventing the company from going bankrupt."  *Abadi*, 2024 WL 1346437, at *33; *Phillips v. Goldsteins', Rosenbergs', Raphael-Sachs, Inc.*, No. 12-CV-3833, 2013 WL 6506170, at *4 (E.D. Pa. Dec. 10, 2013). This, they say, is assistance "as a whole," whereas funding for "job training" is not.  *Abadi*, 2024 WL 1346437, at *33; *Phillips*, 2013 WL 6506170, at *4.  But even bankruptcy funding still has "some specific purpose" — namely, allowing a company to continue to pay its creditors.

As applied to Title VI, then, we must look to the breadth of the company's operations affected by the funding,

12

with a focus on whether the federal funding extends to one geography, division, or subsidiary of the corporation — or, on the other hand, to all of it.

**C.    Application of Section 2000d-4a to American's Funding**

As noted above, American received two kinds of federal funding during the relevant period of January 2021.  The first does not constitute funding to the corporation "as a whole," in light of the framework set out above.  The second does.

1.  <u>EAS Program</u>

The subsidies American received under the EAS program were plainly not funding to the corporation "as a whole." Congress established the EAS program to ensure access to air travel to and from destinations that would not otherwise be profitable for the airlines to serve.  *See generally* 49 U.S.C. § 41733.  As one court put it, the program "subsidizes air transportation to and from airports in certain eligible communities" to guarantee that private air carriers serve areas that otherwise are unable to generate a "sufficient demand for the service to meet its cost."  *Mesa Air Grp. v. Dep't of Transp.*, 87 F.3d 498, 500 (D.C. Cir. 1996).

The EAS is thus narrow in scope.  At the time of the Abayevs' flight, the EAS subsidized just *six routes* that American flew, totaling seventy-six round trips each week.  *See* U.S. Dep't of Transp., March 2021 Subsidized Essential Air

Service communities (48 Contiguous States, Hawaii, and Puerto Rico).[11]  Those flights constituted a small portion of American's network, which planned to add more than 150 new routes in the summer of 2021 alone.  American Airlines Group Inc., Exhibit 99.1 to Form 8-K (July 22, 2021).  And American's EAS funding totaled just $4.3 million, *see* Pl.'s Resp. Mem. Ex. 3 ("Pl.'s Ex."), at 331-35, ECF No. 35-2 — a significant investment of taxpayer funds, to be sure, but a tiny fraction of the $30.9 *billion* in operating expenses that American reported that year.  American Airlines Group Inc., Annual Report (Form 10-K) 96 (Feb. 22, 2022).  Because the funding applies to a small part of American's operation, it cannot constitute funding to the company "as a whole."

    2.   <u>Payroll Support Program</u>

In stark contrast to the limited scope of the EAS program, the Payroll Support Program touched virtually every aspect of American's business.  The program provided COVID-19 relief funds to American (and other airlines) as part of the CARES Act.  15 U.S.C. §§ 9071-80; Pl.'s Ex. 40.  In April 2020, American signed an agreement with the Department of the Treasury that remained in effect at the time of the Abayevs' flight.

---

[11] Accessible at https://www.transportation.gov/sites/dot.gov/files/2021-04/Subsidized%20EAS%20report%20for%20communities%20in%2048%20states_HI_PR_Mar 2021_1.pdf (last accessed Sept. 22, 2025).

Payroll Support Program Agreement ("PSP Agreement") 1-3, ECF No. 39-1. That agreement provided American $2.9 billion "exclusively for the continuation of payment of Wages, Salaries, and Benefits" to its employees.[12]  *Id.* at 4.[13]  The definition of "employee" is extremely broad, including "salaried, hourly, full-time, part-time, temporary, and leased employees" based in the United States.  *Id.* at 5.  It excepts only corporate officers and independent contractors.  *Id.*[14]

So, the program benefitted American employees working across the country in all aspects of its business: reservation agents, check-in desk representatives, gate agents, baggage handlers, maintenance staff, administrative assistants, pilots, flight attendants, and so on.  Under any rational reading, the program touched "all of the operations" of the airline, *see* 42 U.S.C. § 2000d-4a (introduction), and extended to the corporation "as a whole," *id.* § 200d-4a(3)(A)(i).[15]

---

[12] For comparison of scale, we note that the $2.9 billion figure is more than 670 times the size of the $4.2 million in EAS funding discussed above.

[13] American signed two further agreements with the Department of the Treasury, though only this first contract was in effect at the time of the Abayevs' flight.  ECF Nos. 39-2, 39-3.

[14] "Benefits" is similarly broadly defined, including "pension expenses . . ., all expenses for accident, sickness, hospital, and death benefits to Employees, and the cost of insurance to provide such benefits . . . ."  PSP Agreement 4.

[15] Indeed, the breadth of this program should satisfy the "purpose" driven test as well.  If bankruptcy funding affects the company as a whole because it keeps the entire company solvent, this funding likely did, too: if a once-in-a-century economic shock inhibits an airline's ability to meet payroll, and thereby triggers an exodus of employees, that company is likely (as a matter of common sense) to face a significant mortality risk.

Thus, the airline's argument about the relationship, or "nexus," between the statute and the conduct alleged does not succeed. For the period during which American received CARES Act funding, Title VI applies to the operations of the corporation as a whole.

**D.    American Cannot Be Held Liable for the Acts of its Employees Under Title VI**

While the Abayevs may have adduced sufficient evidence that American (as a whole) received "federal financial assistance," and is thus covered by Title VI, summary judgment must nonetheless be granted. The Abayevs seek to hold American liable for the actions of its lower-level employees, and Title VI does not permit liability on a *respondeat superior* theory.

Title VI prohibits *intentional* violations. *Alexander v. Sandoval*, 532 U.S. 275, 280-81 (2001). A recipient of federal funds is liable "only for its own misconduct. *The recipient itself* must exclude persons from participation in, deny persons the benefits of, or subject persons to discrimination under its programs or activities." *Davis ex rel La Shonda D. v. Monroe Cnty. Bd. of Educ.*, 526 U.S. 629, 640-41 (1999) (emphasis added); *see also Gebser v. Lago Vista Indep. Sch. Dist.*, 524 U.S. 274, 287 (1989) (liability under Title IX

cannot rest "on principles of constructive notice or *respondeat superior*.").[16]

Consistent with this reasoning, courts in this Circuit have uniformly held that no *respondeat superior* liability lies under Title VI. *See Bary v. Delta Airlines*, No. 02-CV-5205, 2009 WL 3260499, at *7 n.7 (E.D.N.Y. Oct. 9, 2009) ("[L]iability under Title VI cannot be imputed to institutions based on the actions of their employees."), *aff'd* 553 F. App'x 51 (2d Cir. 2014); *Goonewardena v. New York*, 475 F. Supp. 2d 310, 328 (S.D.N.Y. 2007); *Rodriguez v. New York Univ.*, No. 05-CV-7374, 2007 WL 117775, at *6 (S.D.N.Y. Jan. 16, 2007).  Other circuits agree.  *See Foster v. Michigan*, 573 F. App'x 377, 389 (6th Cir. 2014) ("*Gebser*'s interpretation that there is no vicarious[] liability under Title IX supports the notion that there is no vicarious liability under Title VI."); *Rodgers v. Smith*, 842 F. App'x 929, 929 (5th Cir. 2021) (per curiam) (reaching same conclusion); *United States v. Cnty. of Maricopa*, 889 F.3d 648, 652 (9th Cir. 2018) (same); *Ingram v. Kubik*, 30 F.4th 1241, 1258 (11th Cir. 2022) (same).[17]

---

[16] *Davis* and *Gebser* addressed Title IX, but the Supreme Court "has interpreted Title IX consistently with Title VI." *Barnes v. Gorman*, 536 U.S. 181, 185 (2002); *see also DT v. Somers Cent. Sch. Dist.*, 348 F. App'x 697, 699 n.2 (2d Cir. 2009).

[17] The Abayevs cite no contrary authority.  Instead, they argue that this line of cases applies only to educational institutions; the same "policy rationale" does not, in their view, apply to airlines.  Glassman Ltr. 2-3, ECF No. 41.  But nothing in *Gebser* limits its application to such institutions.  The Court explained that its "central concern" was "ensuring

So, to prevail on a Title VI claim, a plaintiff must point to a specific policy or practice of the recipient itself that is discriminatory.  *E.g.*, *Bary*, 2009 WL 3260499, at *7 n.7 ("Plaintiff produced no evidence demonstrating that Delta itself acted with the requisite intent by, for example, instituting discriminatory policies or practices.").

Both Abayevs' claims rest exclusively on the conduct of lower-level American employees — two flight attendants and a gate agent — rather than any American policy.  Neither has identified record evidence, for example, of a discriminatory mask or passenger removal policy.

After the Court called for further submissions on this issue, the Abayevs argued that the pilot's "decision to remove Mr. Abayev," and the ensuing maintenance of a sixteen-month ban against him," reflect the kind of "institutional decision-making" that constitutes official policy.  Glassman Ltr. 1–2, ECF No. 41.  That argument does not apply to Regina Abayev, as American never removed her from the plane nor banned her.  Her testimony that a flight attendant told her to "shut up" does not evidence any policy or practice.  *See Kent v. Katz*, 146 F. Supp. 2d 450, 458 (D. Vt. 2001), *aff'd in part,* 312 F.3d 568 (2d Cir.

---

that the receiving entity of federal funds has notice" that it will be liable for noncompliance with Title IX.  *See Gebser*, 524 U.S. at 287-88.

2002) ("In general, a single incident will not suffice to raise an inference of the existence of a custom or policy.")

Mr. Abayev's treatment on the plane (and removal from it) likewise evince the kind of "single incident" that does not constitute policy for purposes of Title VI.  And Abayev has not established that his subsequent *ban* constitutes "policy," either.  Even following *Gebser*, some questions persisted as to whether entity's ban of a single individual can constitute "policy" at all.  *Cf. Goonewardena*, 475 F. Supp. 2d at 328 (assuming without deciding that "an educational institution may be liable under Title VI for the actions of its employees if the institution is 'deliberately indifferent' to discrimination").  For purposes of this analysis, we proceed from the proposition that it can.  But even then, plaintiff must adduce evidence concerning "who at the institution" instituted, or at least knew of, the challenged ban.  *Crandell v. N.Y. Coll. of Osteopathic Med.*, 87 F. Supp. 2d 304, 320 (S.D.N.Y. 2000); *see Zeno v. Pine Plains Cent. School Dist.*, 702 F.3d 655, 666 (2d Cir. 2012) ("Constructive knowledge is not enough; only actual knowledge is a predicate to liability.").

Specifically, to hold the company liable for an unwritten policy or practice, Abayev must point to evidence that "an official who at a minimum ha[d] authority to address the alleged discrimination and to institute corrective measures" on

the company's behalf had "actual knowledge of" the alleged discrimination. *Crandell*, 87 F. Supp. 2d at 320 (quoting *Gebser*, 524 U.S. at 290); *see Khen v. US Coachways, Inc.*, No. 23-CV-10762, 2025 WL 252901, at *4 (S.D.N.Y. Jan. 21, 2025) (dismissing Title VI claim based on plaintiffs' failure to plausibly allege bus corporation's knowledge of allegedly discriminatory policy).

Here, Abayev has adduced *no evidence* of who banned him or how that decision was made. He points to an incident report in which a flight attendant *recommended* his ban (and deposition testimony in which the flight attendant readily acknowledged that recommendation). Incident Rep. 5-6; Kindem Dep. 91:4-10. And he has an email from a generic American Airlines email address telling him of the ban, but giving no indication of what employee (or even corporate department) made the decision. Abayev Ban 2. Indeed, Abayev never deposed the pilot who made the decision to remove him from the flight in question.

This meager evidence does not suffice. With no evidence identifying the decisionmaker, no jury could conclude that he or she even knew that Abayev was Tajikistani, let alone that any alleged "policy" was predicated on that basis. (The

documents in question tend, if anything, to support the opposite conclusion.[18])

       The Abayevs' Title VI claims must be dismissed.

## IV.  Conclusion

       For the foregoing reasons, American's motion for summary judgment is granted.  The Clerk of Court is respectfully directed to enter judgment and close this case.


       SO ORDERED.



                     /s/ Eric Komitee
                  ERIC KOMITEE
                  United States District Judge

Dated:     September 23, 2025
            Brooklyn, New York

---

[18] Three flight attendants filed reports indicating that Abayev had refused to comply with American's mask policy; they said nothing about his national origin.  ECF No. 34-13; Pl.'s Ex. 336-37.  Likewise, American's email to Abayev cites the airline's mask policy and even notes that Abayev would be allowed to travel on American flights "once face coverings are no longer required."  Abayev Ban 2.